**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

KHALID SHAMSUD'DIYN, #330-816[1]      *

Plaintiff      *

v      *      Civil Action No. ELH-15-2928

WARDEN KEITH LYONS      *
CORPORAL JACQUELINE PROCTOR
CORPORAL REGINALD TURNER      *
LIEUTENANT BRANDON BARNETT
SERGEANT ROBERT JORDAN      *

Defendants      *
                    ***

## MEMORANDUM OPINION

Plaintiff Khalid Shamsud'Diyn, a self-represented inmate at Western Correctional Institution ("WCI"), filed a civil rights action under 42 U.S.C. § 1983 against five defendants, in both their official and individual capacities: Keith Lyons, Warden of Jessup Correctional Institution ("JCI"), and JCI Officers Robert Jordan, Brandon Barnett, Reginald Turner, and Jacqueline Proctor. ECF 1. In particular, plaintiff alleges a violation of his rights under the Eighth Amendment, arising out of an incident on September 19, 2015. *Id.* Pursuant to a court Order (ECF 2), plaintiff filed a supplement to his Complaint. ECF 4.

Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. ECF 22. It is supported by a memorandum (ECF 22-1) (collectively, the "Motion") and several exhibits. Plaintiff opposes the motion (ECF 26, "Opposition"), and defendants have filed a

---

[1] The record contains multiple spellings of plaintiff's surname. I shall use the spelling provided by plaintiff on the signature line of ECF 4. *See id.* at 3. The Clerk shall amend the docket to reflect the full spelling of defendants' names.

reply.   ECF 29.[2]   Shamsud'Diyn submitted his own declarations with his Complaint and his Opposition, under penalty of perjury, pursuant to 28 U.S.C. § 1746.   *See* ECF 1 at 8;[3] ECF 26 at 16.[4]

The Motion is ripe for disposition, and no hearing is necessary to resolve it.   *See* Local Rule 105.6.  For the reasons outlined below, the court will grant the Motion in part and deny it in part.

By Order of April 18, 2016 (ECF 25), I denied plaintiff's motion for counsel, without prejudice.   *See* ECF 21.  However, in light of my ruling on the Motion, I will reconsider ECF 21 and grant Shamsud'Diyn's motion for appointment of counsel.

## I.    Background

On September 19, 2015, Turner and Proctor escorted Shamsud'Diyn from his cell to receive his medication.  ECF 4.  According to Shamsud'Diyn, Proctor was not assigned to his tier, the D-tier, but assisted in the escort to confront him about a complaint that he had filed

---

[2] Defendants' reply, ECF 29, contains a two-camera video of the tier where the incident took place.  ECF 29-1.  It was made available to Shamsud'Diyn.  ECF 22 at 4, n. 1.  Due to the significant distance from the cameras to the incident's venue, the DVD provides little evidentiary value.

[3] The court shall cite to the page pagination as reflected in the electronic docketing system.

[4] Plaintiff responded to the reply.  ECF 30.  Given that Shamsud'Diyn has already filed an Opposition to defendants' dispositive motions, his "opposition to defendants' response" (ECF 30) is more properly considered as a motion for leave to file a surreply.

Surreply memoranda are not permitted to be filed absent an order by this court.  *See* Local Rule 105.2(a) (D. Md. 2016).  "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd,* 85 F. App'x 960 (4th Cir. 2004), citing *Lewis v. Rumsfeld,* 154 F.Supp.2d 56, 61 (D. D.C. 2001).  Where, as here, the proposed surreply is simply a rehash of what has already been presented in previously filed responsive pleadings, leave to file a surreply is appropriately denied.

against her on September 14, 2015.  ECF 4 at 3.   Shamsud'Diyn, who was handcuffed, was

in a wheelchair because his left foot was in a brace, and his left wrist was wrapped with an ace

bandage as a result of surgery that took place earlier in September.  ECF 4 at 4.  Plaintiff claims

that, when he refused to discuss his complaint against Proctor, she sprayed pepper spray directly

into his right eye, while Turner stood by and did nothing.  ECF 4 at 5.  Jordan took plaintiff to

the medical unit after the incident.  ECF 4 at 4.  Plaintiff claims that he heard Jordan ask

Turner, "what did [Officer Proctor] do this time?"  ECF 4 at 5.  Further, Shamsud'Diyn claims

that Lyons transferred him to Western Correctional Institution in retaliation for bringing suit,

where he remains, despite the presence of known enemies at that institution.  Plaintiff seeks

injunctive and declaratory relief as well as money damages.  ECF 4 at 5.

Defendants present a different version of events.  Proctor avers that on September 19,

2015, Shamsud'Diyn was on disciplinary segregation status and confined to a single cell.

Proctor Decl., ECF 22-3, ¶ 7.[5]  Proctor avers that she reported to C wing, B Building at about

1:50 p.m. to assist Turner with escorting Shamsud'Diyn to the medical unit to receive his

medication *Id.* at ¶ 8; *see also* "Officer's Use of Force Incident Report," ECF 22-3 at 6.

Shamsud'Diyn, wearing a white t-shirt and baggy shorts, exited his cell in a wheelchair.  ECF

22-3 at 6; ECF 29-1, DVD of tier.  After Proctor wheeled Shamsud'Diyn down the hall, she

decided to return Shamsud'Diyn to his cell so he could dress in the required orange segregation

jumpsuit before leaving the tier.  ECF 22-3 at 6.[6]  When plaintiff was told that he needed to

---

[5] Although unclear, it appears that Shamsud'Diyn may have been placed in segregation following incidents with other JCI officers on August 27, 2015, September 6, 2015, and September 7, 2015.  ECF 22-3, ¶¶ 3-4.

[6] Defendants state that disciplinary segregation prisoners are required to wear orange jumpsuits when out of their cells.  Turner Decl., ECF 22-2, ¶ 9; Proctor Decl., ECF 22-3, ¶ 7. Defendants have not provided a copy of the prison rule supporting this requirement.

change his clothes, Shamsud'Diyn stood up from his wheelchair, cursed, and threatened to assault Proctor, lunging at her with his fists.  Proctor responded by firing a one or two second burst of pepper spray.  ECF 22-3 at 4; ECF 22-2, ¶¶ 10-13; ECF 22-2 at 3.  Shamsud'Diyn walked back to his cell.  ECF 29-1, DVD.  Proctor informed Jordan of the incident, and Jordan and Barnett entered the tier and escorted Shamsud'Diyn to the medical unit for treatment.  ECF 22-2 at 6.  Turner denies Shamsud'Diyn's claim that, after the incident, Jordan then asked him, "What did she [Officer Proctor] do this time?"  *Id.* ¶ 16.

Registered Nurse ("RN") Mariama Coker found Shamsud'Diyn oriented to name, place, date, time, and situation.   ECF 22-4 at 1 (Simmons Decl.); ECF 22-4 at 2 (record of plaintiff's nurse visit on September 19, 2015).  Coker found no swelling, bruising, or open areas on the skin, he was provided with boxes of milk, which he used to wash his face and eyes.  ECF 22-4 at 2.  Shamsud'Diyn was provided two additional boxes of milk to take to his cell.  *Id.*  Coker noted that Shamsud'Diyn was calm and relieved from any burning sensation at the time he was returned to his cell an hour later. *Id.* During treatment, Shamsud'Diyn admitted to Coker that he was attempting to get up from his wheelchair to pull up his pants prior to being sprayed.  *Id.*

## II.      Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters

outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, _____ Fed. App'x _____, No. 15-2589, slip op. at 7 (4th Cir. Nov. 29, 2016) (per curiam).   However, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC, supra,* slip op. at 7 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not

consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, ____ Fed. App'x ____, 2016 WL 3755783, at \*5-6 (4th Cir. July 14, 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015).  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f))

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a

genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted).

According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 2016 WL 3755783, at *5; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008).  Moreover, "[t]his is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 2016 WL 3755783, at *5.

Plaintiff has not filed an affidavit under Rule 56(d). Moreover, I am satisfied that it is appropriate to address the defendants' Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile*

*Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black &. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact. *See Anderson*, 477 U.S. at 247-48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

### III.    Discussion

Defendants raise four affirmative defenses, which I shall discuss, in turn.

### A.

Defendants argue that Samsud'Diyn's request for monetary damages against them in their official capacity for alleged constitutional violations is barred by Eleventh Amendment

immunity.  ECF 22 at 9-10.  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  Sovereign immunity accords states the dignity that is consistent with their status as sovereign entities.  *Fed. Mar. Comm'n v. S. Carolina State Ports Auth.*, 535 U.S. 743, 760 (2002).[7]

The Eleventh Amendment bars suit in federal court against a state by its own citizens, absent consent or a valid Congressional abrogation of sovereign immunity.  *See Coleman v. Court of Appeals of Maryland*, , —— U.S. ——, 132 S. Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Board of Trustees of Univ. of Alabama v. Garett*, 531 U.S. 356, 363 (2001); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States." (internal quotation marks and citation omitted)); *Pennhurst State School and Hospital v Halderman*, 465 U.S. 89, 100 (1984).

Under Eleventh Amendment jurisprudence, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself."  *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989).  Therefore, official capacity claims are subject to sovereign immunity under the Eleventh Amendment.  *Kentucky v. Graham*, 473 U.S. 159, 167 (1985);

---

[7] The Eleventh Amendment did not *create* sovereign immunity; rather, it *preserved* the sovereign immunity that the states enjoyed prior to the formation of the Union.  *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, --- U.S. ---, 131 S. Ct. 1651, 1657-58 (2011).

*accord Hafer v. Melo*, 502 U.S. 21, 25 (1991).  As the Supreme Court explained in *Graham*, 473 U.S. at 165: "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.,* 436 U.S. 658, 690, n. 55 (1978)) (citations omitted); *see also*, *e.g.*, *Huggins v. Prince George's Cnty.*, 683 F.3d 525, 532 (4th Cir. 2012) (treating suit against individuals in official capacity as suit against county).  Therefore, states and their officers, sued in their official capacities, are not "persons" subject to suit for money damages under 42 U.S.C. § 1983.  *Will*, 491 U.S. at 71.

Sovereign immunity precludes a private individual not only from suing an unconsenting state in federal court, but also extends to an instrumentality of a state (also referred to as an "arm of the state"), absent waiver or Congressional abrogation.  In *Pennhurst State School & Hospital*, 465 U.S. at 101-02, the Court said: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."; *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013).

The State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts.  *See* Md. Code, State Gov't. Art., § 12–201(a).  But, it has not waived its immunity under the Eleventh Amendment to a suit of this kind in federal court.

To be sure, there are several exceptions to the Eleventh Amendment bar.  *See*, *e.g.*, *Equity In Athletics, Inc. v. Department of Education*, 639 F.3d 91, 107 n. 13 (4th Cir. 2011) (listing exceptions). For example, the Eleventh Amendment does not prevent private individuals from bringing suit against State officials for prospective injunctive relief or declaratory relief for ongoing violations of federal law. The record, however, does not support any claim of ongoing

unconstitutional conduct on the part of corrections personnel.   Therefore, each defendant is entitled to dismissal with regard to Shamsud'Diyn's claims against them in their official capacities.

**B.**

Defendants also assert entitlement to qualified immunity, arguing that their conduct did not violate any clearly established constitutional right of which a reasonable public official should have known.   ECF 7-1 at 17-18.   *See Harlow v. Fitzgerald,* 457 U.S. 800 (1982); *see also Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   Qualified immunity is an "'*immunity from suit* rather than a mere defense to liability' . . . ." *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*).   Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'" *Ussery*, 786 F.3d at 337 (quoting *Mitchell*, 472 U.S. at 526).

"Qualified immunity shields government officials who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 401 (4th Cir. 2015) (internal quotations omitted); *see also Scinto v. Stansberry* ____ F.3d ____, 2016 WL 6543368, at *10 (4th Cir. Nov. 4, 2016).   In *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 395 (4th Cir. 2014),   *cert. denied sub nom. Baltimore City Police Dep't v. Owens*, ⸻ U.S. ⸻, 135 S. Ct. 1983 (2015), the Court reiterated:   "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Saucier v. Katz*, 533 U.S. 194, 206

(2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, *supra*, at 730 F.3d 391; *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.), *cert. denied*, —— U.S. ——, 133 S. Ct. 789 (2012).  Thus, "a government official who is sued in his individual capacity may invoke qualified immunity." *Bland*, 730 F.3d at 391; *see Harlow,* 457 U.S. at 818.[8]

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan,* 555 U.S. at 231.  In *Pearson,* the Court said, *id.*:  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Notably, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, –—— U.S. ——, 134 S. Ct. 3, at *5 (2013) (per curiam).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law", *Harlow*, 457 U.S. at 818, and so an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity.  It protects officials "'who commit constitutional violations but who, in light of

---

[8] The defense of qualified immunity does not apply to claims for injunctive relief.  *See Pearson v. Callahan,* 555 U.S. at 242-43 (affirming that defendants may not seek qualified immunity "in cases in which that defense is not available, such as … § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"); *Lefemine v. Wideman*, 672 F.3d 292, 303-04 (4th Cir.) ("Claims for declaratory and injunctive relief are not affected by qualified immunity."), *rev'd on other grounds*, —— U.S. ——, 133 S. Ct. 9 (2012); *accord Vollette v. Watson*, 937 F. Supp. 2d 706, 720 (E.D. Va. 2013).

clearly established law, could reasonably believe that their actions were lawful.'" *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Purnell*, 652 F.3d at 531 (4th Cir.)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). In other words, qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane v. Franks*, ⸺ U.S. ⸺, 134 S. Ct. 2369, 2381 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (en banc), *cert. denied*, ⸺ U.S. ⸺, 132 S. Ct. 781 (2011) (citation omitted); *see also, e.g.*, *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265-66 (11th Cir. 2004).

In *Scinto*, *supra*, at *10, the Court explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question." (Citations omitted.) Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right," *Saucier*, *supra*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant*, *supra*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Owens*, *supra*, 767 F.3d at 395-96. The "two inquiries . . . may be assessed

in either sequence." *Merchant*, 677 F.3d at 661-62; *accord Pearson*, 555 U.S. at 236 (stating that judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, ⎯⎯ U.S. ⎯⎯, 132 S. Ct. 1235, 1245 (2012) (citing *Creighton,* 483 U.S. at 639). If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue. *Scinto*, *supra*, at *10; *Occupy Columbia*, 738 F.3d at 118. "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, ⎯⎯ U.S. ⎯⎯, 135 S. Ct. 348, 350 (2014) (quoting *Creighton,* 483 U.S. at 640). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll*, 135 S. Ct. at 350 (quoting *al-Kidd*, *supra*, 563 U.S. at 741); *see City and County of San Francisco v. Sheehan*, ⎯⎯⎯ U.S. ⎯⎯⎯, 135 S. Ct. 1765, 1774 (2015); *Plumhoff v. Rickard*, 572 U.S. ⎯⎯⎯, 134 S. Ct. 2012, 2023 (2014); *see also Reichle v. Howards*, ⎯⎯ U.S. ⎯⎯, 132 S. Ct. 2088, 2093 (2012) ("To be clearly established, a right must be sufficiently clear that 'every reasonable official

would [have understood] that what he is doing violates that right'") (some quotation marks and citations omitted). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, ⸺ U.S. ⸺, 135 S. Ct. at 1774 (citation omitted).

In determining whether a right was clearly established, courts in this Circuit "'ordinarily need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose,'" as of the date of the conduct at issue. *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citations omitted), *cert. denied*, ⸺ U.S. ⸺, 131 S. Ct. 392 (2010). "[A] right may be clearly established by any number of sources, including a criminal case, a statute, or the Constitution itself." *Owens*, *supra*, 767 F.3d at 399. However, there need not be a case "directly on point . . . ." *al-Kidd*, 563 U.S. at 741.

The question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, *supra*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

It is true that the court cannot require prison officials to possess "the legal knowledge culled 'by the collective hindsight of skilled lawyers and learned judges,' but instead only 'the legal knowledge of an objectively reasonable official in similar circumstances at the time of the

challenged conduct.'" *Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007) (quoting *Jackson v. Long*, 102 F.3d 722, 731 (4th Cir. 1996)).   The Eighth Amendment claim raised here presents the proverbial "age old question" of whether prison officials used excessive force. The answer is determined by inquiring if "'force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Hudson v. McMillian*, 503 U. S. 1, 6 (1992) (citations and some quotations omitted).   This principle was clearly established long ago.   Thus, defendants cannot claim qualified immunity.

## C.

Defendants Lyons, Barnett, and Jordan argue that they were not involved in the use of force incident, and thus cannot be held liable based solely on their status as supervisors.   It is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims.   *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no *respondeat superior* liability under § 1983).   Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury

suffered by the plaintiff.  *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Where, as here, a plaintiff points to no action or inaction on the part of supervisory defendants that resulted in a constitutional injury, the claims against supervisory personnel must be dismissed.

### D.

Defendant Lyons also asserts that Shamsun'Diyn's retaliation claim has not been properly presented through the administrative remedy procedure and therefore it must be dismissed pursuant to 42 U.S.C. §1997e.  ECF 29 at 3-5.   The Prisoner Litigation Reform Act provides, in pertinent part, 42 U.S.C. § 1997e:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd,* 98 Fed. Appx. 253 (4th Cir. 2004).[9]

---

[9] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted).  Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id.* at 651, 898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, ____ U.S. ____, 136 S. Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French* 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . .   normally creates an obligation impervious to judicial discretion")).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative

---

contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase v. Peay*, 286 F. Supp. at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette,* 517 F.3d at 725, 729; *see Langford v. Couch,* 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he PLRA amendment made clear that exhaustion is now mandatory."). But, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, ____ U.S. ____, 136 S. Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id.* at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id.* at 1855.

The Fourth Circuit addressed the meaning of "available" remedies in *Moore v. Bennette,* 517 F. 3d at 725, stating:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively. *Id.* at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

More recently, the Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'"  136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738).   Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit.  *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, Shamsud'Diyn is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct).   Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure.  *See Booth*, 532 U.S. at 741.

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).   But, the *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play."  136 S. Ct. at 1859.  These are when the remedy operates as a "simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; the administrative scheme

might be so "opaque" as to become "practically speaking, incapable of use"; and prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an "administrative remedy procedure" ("ARP") available to Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code (2008 Repl. Vol.), Correctional Services Article ("C.S."), §§ 10-201 *et seq.*; Code of Maryland Regulations ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against…official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC]…against any officials or employees of the [DOC]…arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8).   An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D; DCD 185-002 (effective August 27, 2008).

To pursue a grievance, a prisoner confined in a DOC facility may file with the Inmate Grievance Office ("IGO") a grievance against any DOC official or employee. C.S. § 10-206(b).  However, if the DOC institution has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process, before filing a grievance with the IGO. *See* C.S. § 10-206(b); *see also* OPS.185.0002.02.[10]   And, DPSCS has established an administrative remedy procedure process that applies to DOC facilities. OPS.185.0002.02.

---

[10] OPS.185.0002 is an Executive Directive created by the Maryland Department of Public Safety and Correctional Services, titled "Administrative Remedy Procedure (ARP)" ("ARP Directive").  The ARP Directive was submitted as a defense exhibit in the case of *Payton v.*

The ARP process consists of multiple steps.  For the first step, a prisoner is required to file his initial ARP with his facility's "managing official."  OPS.185.0002.05C(1).  C.S. § 1-101(k) defines a managing official "as the administrator, director, warden, superintendent, sheriff, or other individual responsible for the management of a correctional facility."  In the DOC, each facility's warden is responsible for the administrative remedy procedure at the institutional level.  DCD # 185-003VI.  Moreover, the ARP request must be filed within 30 days of the date on which the incident occurred, or within 30 days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later.  COMAR 12.07.01.05A.

The second step in the ARP process occurs if the managing official denies a prisoner's initial ARP.  In that circumstance, the prisoner has 30 days to file an appeal with the DPSCS's Deputy Secretary for Operations or that official's designee.  OPS.185.0002.05C(2).  For

---

*Bishop*, ELH-15-3648, ECF 16-2.  Effective August 14, 2015, the ARP Directive establishes the "policy and procedures for an Administrative Remedy Procedure (ARP) . . . to provide a method for resolving an inmate complaint related to specific conditions of confinement."  *Id.*  Similarly, DCD #185-003 and DCD #185-004 were submitted as exhibits in ELH-15-3645, at ECF 16-3 and 16-4, respectively.  All of these exhibits are subject to judicial notice.

"[A] court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b)(2) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, __ U.S. __, 132 S. Ct. 115 (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). In particular, pursuant to Fed. R. Evid. 201, a court may take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute," in that it "(1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  In *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n. 1 (4th Cir. 1990), the Court recognized that a district court may "properly take judicial notice of its own records."

prisoners in DOC facilities, the Commissioner of Correction is the official to whom this appeal is sent.  DCD # 185-004VI.

If the Commissioner of Correction denies an appeal, the prisoner has 30 days to file a grievance with the IGO.  OPS.185.0002.05D; C.S. § 10-206(a); C.S. § 10-210; COMAR 12.07.01.05B; *see also* DCD 185-002, § VI(N)(1).  When filing with the IGO, a prisoner is required to include copies of the following: the initial request for administrative remedy, the warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response.  COMAR 12.07.01.04(B)(9)(a).  If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing.  C.S. § 10-207(b)(1); *see* COMAR 12.07.01.07B.

An order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.S. § 10-208(2)(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute.  *See* C.S. § 10-208; COMAR 12.07.01.07D; *see also* Md. Code, Title 10 of the State Government Article.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination.  C.S. § 10-209(b)(1)(i) & (ii); COMAR 12.07.01.10A.  However, if the ALJ concludes that the inmate's complaint is wholly or partly meritorious, the decision constitutes a recommendation to the Secretary of DPSCS, who must make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge. *See* C.S. § 10-209(b)(2), (c).

24

The final agency determination is subject to judicial review in Maryland State court, so long as the claimant has exhausted his/her remedies. *See* C.S. § 10-210. But, an inmate need not seek judicial review in State court in order to satisfy the PLRA's administrative exhaustion requirement. *See, e.g., Pozo*, 286 F.3d at 1024 ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court.").

The ARP process applies to the majority of inmate complaints. However, it does not apply to case management decisions, which are to be directly grieved to the IGO. OPS.185.0002.05F(1). Nor does it apply to Maryland Parole Commission procedures and decisions to withhold mail, or Prison Rape Elimination Act related claims. OPS.185.0002.05F(2),(4),(5). Those categories of complaints are addressed through separate administrative processes. *Id.*

Finally, the ARP process does not apply to complaints relating to prisoner disciplinary procedures and decisions. OPS.185.0002.05C(3). If a prisoner is found guilty of a rule violation, the prisoner is entitled to appeal the hearing officer's guilty decision or sanction to the warden of the facility where he or she is incarcerated. COMAR 12.02.27.33(A)(1),(2). If the prisoner does not file a written appeal with the warden within fifteen days of receipt of the hearing officer's decision, he or she is considered to have waived the right to appeal. *Id.*, COMAR 12.02.27.33(A)(3). If the warden affirms the hearing officer's guilty finding or sanction, the prisoner may then appeal to the IGO. COMAR 12.02.27.33(D); *see also* COMAR 12.07.01.05 and .06C. When filing this appeal with the IGO, the prisoner is required to include a copy of the initial notice of inmate rule violation, the hearing record, the appeal to the warden, and the warden's response to the appeal. COMAR 12.07.01.04(B)(9)(b).

While a prisoner may pursue the ARP process to allege that correctional officers used excessive force, such ARPs may be procedurally dismissed if the Internal Investigations Division has decided to conduct an investigation into the use of force incident at issue in the ARP.  OPS.185.0002.05.E(6) & K(3)(e).  If this procedural dismissal indicates that no further action may be taken through the ARP process, a prisoner may then file a grievance directly with the IGO, as there would be no further administrative remedies available through the ARP process.  G.S. § 10-206(b).

As noted, Lyons raises non-exhaustion as an affirmative defense.  Shamsud'Diyn's retaliation claim must be dismissed if Lyons establishes that Shamsud'Diyn failed to exhaust available remedies prior to filing this lawsuit. *See Jones*, 549 U.S. at 216 – 17 (failure to exhaust is an affirmative defense and inmates are not required to demonstrate exhaustion in their complaints).  As indicated at length above, the PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.

Shamsud'Diyn exhausted his retaliation claim with the Warden and before the Commissioner of Correction (ECF 26 at 14), but failed to complete the grievance procedure by appealing the denial of his claim to the Executive Director of the IGO prior to initiating his federal lawsuit. *See* C.S. §§ 10-206, 1-210; COMAR 12.07.01.05.

Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds).  As explained by defendants, allowing a prisoner suit to proceed, so long as the prisoner eventually fulfills the exhaustion requirement, undermines Congress's directive to pursue administrative remedies prior to filing a complaint in

federal court. *Neal*, 267 F.3d at 123. Indeed, if during the pendency of a suit the administrative process were to produce results benefitting plaintiff, the federal court would have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset. *Id.*

In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *See Kitchen v. Ickes*, Civil Action No. DKC-14-2022, 2015 WL 4378159, at *8 (D. Md. July 14, 2015); *see also Blackburn v. S. Carolina*, No. C A 006-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009) *aff'd,* 404 F. App'x 810 (4th Cir. 2010); *Kaufman v. Baynard*, CIV.A. 1:10-0071, 2012 WL 844480 (S.D.W. Va. Feb. 3, 2012) *report and recommendation adopted,* CIV.A. 1:10-0071, 2012 WL 844408 (S.D.W. Va. Mar. 12, 2012); *Miller v. McConneha*, *et al*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D. Md. November 11, 2015).

Although the retaliation claim is not exhausted and cannot proceed as a free-standing claim,  the court shall nonetheless address Shamsud'Diyn's claim that he is endangered by unidentified prisoners at WCI who assaulted him on November 22, 2010, and may still be housed there.  This claim provides the basis for Shamsud'Diyn's injunctive relief request for a transfer.  ECF 26 at 15-16.  Defendants state that the Internal Investigation Unit identified two prisoners in that assault, and that neither was confined at WCI on any date after September 19, 2015.  ECF 29-3 at 1 (Brengle Decl.), and attached IIU report, ECF 29-3 at 2-19; ECF 29-4 (Emerick Decl.).  Based on these representations, Shamsud'Diyn's request for injunctive relief shall be denied.

**E.**

Shamsud'Diyn's claim of excessive use of force remains.  Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992).  This court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response.  *Whitley v. Albers*, 475 U.S. 312, 321 (1986).  The absence of significant injury alone is not dispositive of a claim of excessive force.  *Wilkins v. Gaddy*, 559 U.S. 34 (2010).  Rather, the extent of injury incurred is one factor indicative of whether or not the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm.  *Id*. at 38.

The parties do not dispute that while Proctor and Turner were escorting Shamsud'Diyn to the medical unit, Shamsud'Diyn rose from his wheelchair and walked back into his cell.  Any agreement between the parties as to the material facts ends there.  Shamsud'Diyn claims that he rose to pull up his sagging pants.[11]  He argues that Proctor's claim that he escalated the situation when told he would be returned to his cell to change into a jumpsuit is pretext, used to conceal her true intention to punish him for an earlier complaint.  Proctor claims Shamsud'Diyn became enraged and acted aggressively towards her when informed of the jumpsuit requirement,

---

[11] Although the videotape does not present a clear picture as to the entire incident, it does show that Shamsud'Diyn's pants were sagging, and that he reached to tug and hold them in place.  *See also* Nurse Coker's medical report, ECF 22-4 at 2.

justifying her use of pepper spray.   Turner alleges the entire incident occurred quickly and unexpectedly, and supports Proctor's use of force.

Thus, the core inquiry concerning use of force remains disputed based on the material presented to the court.   Whether Proctor acted maliciously and sadistically to cause harm to Shamsud'Diyn because he had complained about her and whether Turner failed to act to protect Shamsud'Diyn from such misconduct, or whether each of their actions were undertaken in an effort to maintain order, are disputed by the parties.   The issue requires credibility determinations not appropriate for resolution on summary judgment.   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.     Conclusion

For these reasons, defendants Lyons, Barnett and Jordan are entitled to summary judgment and shall be dismissed from the case.   However, summary judgment shall be denied as to the use of force allegations against Proctor and Turner.   A separate Order follows.


December 9, 2016                              _____/s/_____
Date                                                 Ellen L. Hollander
                                                        United States District Judge